**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Joseph I. Marchese (*Pro hac vice* Forthcoming)
888 Seventh Ave, Third Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jmarchese@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER URBAN, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| KEYBANK, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Peter Urban, ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint ("Complaint") against Defendant KeyBank ("KeyBank" or "Defendant"), based upon personal knowledge with respect to himself, and on information and belief and the investigation of counsel as to all other matters, in support thereof alleges as follows:

## INTRODUCTION

1.      Defendant KeyBank wrongfully and unlawfully charged Plaintiff and the class members Overdraft fees and Non-Sufficient Funds ("NSF") fees in breach of its contracts with its customers.

2.      This is a civil action seeking monetary damages, restitution, and injunctive and declaratory relief from Defendant KeyBank ("KeyBank") arising from its unfair and unconscionable assessment and collection of Overdraft/NSF Fees in breach of KeyBank's contracts with its customers.

3.      At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, KeyBank immediately decrements consumers' checking accounts for the amount of the purchase and sets aside funds in a checking account to cover that specific transaction.  As a result, and with limited exceptions, customers' accounts always have sufficient available funds to cover these transactions throughout their entire life-cycle.

4.      However, KeyBank still assesses crippling $38.50 Overdraft fees on many of these transactions, in violation of its contractual promises not to do so.

**A.      KeyBank Breaches Its Contracts With Customers By Charging Overdraft Fees On "Authorize Positive, Purportedly Settle Negative" Transactions**

5.      Despite putting aside sufficient available funds for debit card transactions, KeyBank charges Overdraft fees on those same transactions if they purportedly settle—days later—into a negative balance ("Authorize Positive, Purportedly Settle Negative Transactions" or "APPSN Transactions").

6.      KeyBank maintains a running account balance in real time, tracking funds consumers have for immediate use.  This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instant they are made.  When a customer makes a

purchase with a debit card, KeyBank sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's account balance.   Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

7.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

8.     That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has been reduced to account for earlier debit card transactions.   As such, many subsequent transactions incur Overdraft fees due to the unavailability of the funds sequestered for those debit card transactions.

9.     Still, despite keeping those held funds off-limits for other transactions, KeyBank improperly charges Overdraft fees on APPSN Transactions—the latter of which always have sufficient available funds to be "covered."

10.     Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not

appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair."

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf (last visited November 18, 2020).

11.     There is no justification for these practices other than to maximize KeyBank's Overdraft fees revenue.  APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance.  But KeyBank is free to protect its interests and either reject those intervening transactions or charge Overdraft fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.  But KeyBank was not content with these millions in Overdraft fees.  Instead, it sought millions more in Overdraft fees on APPSN Transactions.

12.     Besides being deceptive, unfair and unconscionable, these practices breach contract promises made in the KeyBank's adhesion contracts—contracts which fundamentally misconstrue the true nature of the KeyBank's processes and practices.  These practices also exploit contractual discretion to gouge consumers.

13.     In plain, clear, and simple language, KeyBank's Deposit Account Agreement promises that the KeyBank will only charge Overdraft fees on transactions with insufficient funds to "cover" a given transaction:

> In our discretion, we may decide to pay/process a check, recurring debit card transaction, preauthorized automatic debit, telephone-initiated transfer, electronic transfer or other item as a service to you even if the available balance in the Account on which it was drawn/debited is not sufficient to cover the transaction. When we do so the payment may create an "overdraft" in your Account.

Ex. A, KeyBank's "Deposit Account Agreement and Funds Availability Policy."

14.     But for APPSN transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to "cover" those transactions—yet KeyBank assesses Overdraft fees on them anyway.

15.     Moreover, KeyBank reaffirms that debit cards transactions are "authorized," "pa[id]" and "process[ed]" immediately, in one fell swoop:

> In our discretion, **we may decide to pay/process** a check, recurring debit card transaction, preauthorized automatic debit, telephone-initiated transfer, electronic transfer or other item as a service to you even if the available balance in the Account on which it was **drawn/debited** is not sufficient to cover the transaction.

Ex. A, KeyBank's "Deposit Account Agreement and Funds Availability Policy."

> KeyBank will not **authorize and pay** overdrafts for the following types of transactions unless you ask us to….

https://www.key.com/personal/checking/overdraft-protection-options.jsp (last visited November 18, 2020). (emphasis added)

16.     This promise indicates that transactions are only overdraft transactions when they are "authorized" and "paid" "pa[id]/process[ed]" into a negative balance. Of course, that is not true for APPSN transactions.

17.     Lest there be any doubt, KeyBank also clarifies that "authorization" and "pay[ment]" are a linked and essentially coterminous process—in other words, that authorization necessitates payment, and account balances are deducted once for any given transaction:

> If you do not contact us to make an overdraft services selection, we will consider this to mean you do not want us to authorize and pay overdrafts on ATM and everyday debit card transactions.

*Id.*

18.    In fact, KeyBank actually "authorizes" transactions on positive funds, sets those funds aside on a hold, then fails to use those same funds to "pay" those same transactions when they settle.

19.    All these representations and contractual promises are untrue.  In fact, KeyBank charges Overdraft fees even when sufficient funds exist to "cover" transactions that are "authorized and pa[id]" into a positive balance.

20.    Counterintuitively, this means KeyBank actually debits an account twice for the same transaction—not just at the moment of purchase, but later during a secret posting process described below.

21.    KeyBank breaches these plain contractual promises when it assesses Overdraft fees on APPSN Transactions that did have funds to cover them throughout their lifecycle.  By definition, there are always available funds sufficient to "cover" debit card transactions authorized into positive funds, for the simple reason that those funds are sequestered at the instant of authorization (as described above).

22.    The contract also fundamentally misconstrues the process by which Overdraft fees are determined—and, more generally, how debit card transactions are executed.

23.    In short, KeyBank is not authorized by contract to charge Overdraft fees on APPSN Transactions, but it has done so and continues to do so, to the tune of tens of millions of dollars in consumer harm every year.

24.    In fact, according to the SEC disclosures of KeyBank's parent company, KeyBank realized over $1 billion in revenue from service charges that include "overdraft [and] non-sufficient funds" fees.[1]

25.    This practice breaches KeyBank's contracts.

---

[1] KeyCorp FORM 10-K,
https://www.sec.gov/ix?doc=/Archives/edgar/data/91576/000009157620000007/key-123119x10k.htm.

**B.     KeyBank Breaches Its Contracts With Customers By Charging Multiple Non-Sufficient Funds Fees On The Same Transaction**

26.     But KeyBank's reprehensible behavior does not stop there.  KeyBank also participates in the unlawful business practice of imposing multiple Non-Sufficient Funds Fees ("NSF Fees") on the same transaction.[2]

27.     KeyBank documents permit KeyBank to charge a single $38.50 NSF Fee when it determines a customer's account contains insufficient funds to pay a transaction and it rejects the charge.  *See* Ex. A, KeyBank's "Deposit Account Agreement and Funds Availability Policy."

28.     Through the imposition of NSF Fees, KeyBank makes tens of millions of dollars annually often at the expense of its most vulnerable customers.  In doing so, KeyBank violates its Code of Ethics, which requires "operating with the highest degree of integrity," as well as requiring employees to "[c]onduct every aspect of Key's business in an honest, ethical, and legal manner in accordance with all applicable laws, rules, and regulations of the localities, states, and countries where Key does business."  *See* https://www.key.com/kco/images/KeyCorp_Code_of_Ethics_2020.pdf (last visited on November 18, 2020).

29.     Even if KeyBank had right to reject the transaction and charge a single NSF Fee, KeyBank unlawfully maximizes its already profitable NSF Fees with deceptive practices that also violate the express terms of its contract.

30.     Specifically, KeyBank unlawfully assesses multiple NSF Fees on a single transaction or check.

31.     Unbeknownst to consumers, each time KeyBank reprocesses a transaction or check for payment after it was initially rejected for insufficient funds, KeyBank chooses to treat it as a new and unique item or transaction that is subject to yet another NSF Fee.  But KeyBank's Account Documents never disclose that this counterintuitive and deceptive result could be possible and, in fact, suggest the opposite.

---

[2] KeyBank uses the term "overdraft fees" on account statements to refer to all fees involving an overdrawn/insufficient fund issue with an account.  This Complaint distinguishes between the two for the sake of clarity.

32.     KeyBank's Account Documents indicate that only a single NSF Fee will be charged per "transaction" or "item," however, many times that item is reprocessed with no request from the customer to do so.  An electronic item reprocessed after an initial return for insufficient funds, especially through no action by the customer, cannot and does not fairly become a new, unique item for fee assessment purposes.  This is particularly true here, where KeyBank reprocesses the items knowing there are insufficient funds, and thus does so solely to cause additional fees and increase KeyBank's profits at the expense of its customers.

33.     KeyBank breaches its contract when it charges more than one $38.50 NSF Fee on the same item, since the contract explicitly states—and reasonable consumers understand—that the same item can only incur a single NSF Fee.

34.     This practice breaches KeyBank's contracts.

**C.      KeyBank Breaches Its Contracts With Customers By Charging Overdraft Fees To Customers Who Did Not Opt-In To Overdraft Protection**

35.     KeyBank also assess Overdraft fees on customers who have not opted-in to Overdraft protection.

36.     This practice violates KeyBank's contracts with consumers because KeyBank explicitly states:

> We do not authorize and pay an overdraft for Automated Teller Machine ("ATM") and everyday debit card transactions unless you ask us to.

Ex. A, KeyBank's "Deposit Account Agreement and Funds Availability Policy."

> If you do not contact us to make an overdraft services selection, we will consider this to mean you do not want us to authorize and pay overdrafts on ATM and everyday debit card transactions.

*Id.*

37.     Plaintiff and other KeyBank customers have been injured by KeyBank's improper practices.  On behalf of himself and the Classes (defined below), Plaintiff seeks damages, restitution, and injunctive relief for KeyBank's breach of contract, breach of the covenant of good faith and fair dealing, and conversion.

**PARTIES**

38.     While a citizen of California, residing in San Francisco, California, Plaintiff Peter Urban formed a contract with KeyBank to open a checking account using his California address, phone number, and zip code.

39.     Defendant KeyBank is a national bank with its headquarters in Cleveland, Ohio. KeyBank operates numerous branches throughout the United States with corporate offices throughout California.  Among other things, KeyBank is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the putative classes, throughout the United States.

**JURISDICTION AND VENUE**

40.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of each of the Classes is a citizen of a State different from the Defendant.  The number of members of the proposed Classes in aggregate exceeds 100 accountholders. 28 U.S.C. § 1332(d)(5)(B).

41.     This Court has personal jurisdiction over the Defendant because Defendant's actions and omissions committed in or aimed at this District gave rise to the claims alleged in this Complaint.

42.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

**FACTUAL BACKGROUND AND GENERAL ALLEGATIONS**

43.     Plaintiff has a checking account with KeyBank.

44.     KeyBank issues debit cards to its checking account customers, including Plaintiff, which allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals and other electronic debit transactions.

45.     Pursuant to its standard account agreement, KeyBank charges Overdraft fees (at all materials times in the amount of $38.50) for debit card transactions that purportedly result in an overdraft.

**A.     Mechanics Of A Debit Card Transaction**

46.     A debit card transaction occurs in two parts.  First, authorization for the purchase amount is instantaneously obtained by the merchant from the KeyBank. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to KeyBank, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

47.     At this step, if the transaction is approved, KeyBank immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction, but does not yet transfer the funds to the merchant.

48.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

49.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.  This is referred to in the banking industry as "posting" or "settling"—something which may occur several days after the transaction was initially initiated.

50.     There is no change—no impact whatsoever—to the available funds in an account when posting or payment of a transaction that settles in the same amount for which it authorized occurs.  That is because available funds amounts do not change for debit card transactions that settle in the same amount for which they were authorized.

**B.     KeyBank Account Documents**

51.     Plaintiffs' checking accounts with KeyBank were, at all relevant times, governed by

KeyBank's standardized contract for deposit accounts, the material terms of which are drafted by KeyBank, amended by KeyBank from time to time at its convenience and complete discretion, and imposed by KeyBank on all of its customers.

52.    The checking account contract documents covering Overdraft fees promise that the KeyBank will <u>only</u> charge Overdraft fees on transactions with insufficient funds to "cover" a given transaction:

> In our discretion, we may decide to pay/process a check, recurring debit card transaction, preauthorized automatic debit, telephone-initiated transfer, electronic transfer or other item as a service to you even if the available balance in the Account on which it was drawn/debited is not sufficient to cover the transaction.

Ex. A.

53.    The critical contract term "to cover" is never defined.

54.    For APPSN transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to "cover" those transactions—yet KeyBank assesses Overdraft fees on them anyway.

55.    Moreover, KeyBank reaffirms that debit card transactions are "authorized and approved" immediately, in one fell swoop:

> KeyBank will not authorize and pay overdrafts for the following types of transactions unless you ask us to….
> We can't guarantee we will authorize and pay every type of transaction, so you may be declined for the above types of transactions.  Remember, when an overdraft is paid, standard overdraft fees may be assessed. And, if an item is returned unpaid, your account may be charged a non-sufficient funds (NSF) fee.
> * ATM transactions
> * Debit card purchases (purchases made with your debit card on a day-to-day basis)
> If you choose to decline the Overdraft Services, ATM transactions and everyday debit card transactions that would cause your account to be overdrawn will typically be declined. However, overdrafts may still be paid at our discretion on checks, automatic bill payments and recurring debit card transactions.

*See* https://www.key.com/personal/checking/overdraft-protection-options.jsp (last visited November 18, 2020)

56.     This promise also indicates that transactions are only Overdraft fee transactions when they are "authoriz[ed]" into a negative balance.  Of course, that is not true for APPSN transactions.

57.     Lest there be any doubt, KeyBank also clarifies that "authoriz[ation]" and "pay[ment]" are a linked and essentially coterminous process—in other words, that authorization necessitates payment, and account balances are deducted once for any given transaction:

> In our discretion, we may decide to pay/process a check, recurring debit card transaction, preauthorized automatic debit, telephone-initiated transfer, electronic transfer or other item as a service to you even if the available balance in the Account on which it was drawn/debited is not sufficient to cover the transaction.  When we do so the payment may create an "overdraft" in your Account.

Ex. A, KeyBank's "Deposit Account Agreement and Funds Availability Policy."

> KeyBank will not authorize and pay overdrafts for the following types of transactions unless you ask us to….

https://www.key.com/personal/checking/overdraft-protection-options.jsp (last visited November 18, 2020).

58.     In fact, KeyBank actually "authorize[s]" transactions on positive funds, sets those funds aside on a hold, then fails to use those same funds to "pay" those same transactions when they settle.  Instead, it uses a secret posting process described below.

59.     All these representations and contractual promises are untrue.  In fact, KeyBank charges Overdraft fees even when sufficient funds exist to "cover" transactions that are "authorized and approved" into a positive balance.

60.     No express language in any document states that KeyBank may impose fees for overdrafts on APPSN Transactions.

**C.      The Account Documents Misrepresent KeyBank's True Overdraft Fee and Debit Processing Practices**

61.     The Account Documents misrepresent KeyBank's true debit card processing, Overdraft fee, and NSF fee practices in at least three ways.

62.     First, KeyBank charges Overdraft fees on debit card transactions for which there are sufficient available funds to "cover" the transactions.  That is despite contractual representations

that the KeyBank will only charge Overdraft fees on transactions with insufficient available funds to "cover" a given transaction.

63.     KeyBank assesses Overdraft fees on APPSN Transactions that do have sufficient available funds to "cover" them throughout their lifecycle.

64.     Those available funds are sequestered at the moment a debit card transaction is approved by KeyBank.

65.     KeyBank's practice of charging Overdraft fees even where sufficient available funds exist to "cover" a transaction violates a contractual promise not to do so.  This discrepancy between KeyBank's actual practice and the contract causes consumers like Plaintiff to incur more Overdraft fees than they should.

66.     Second, sufficient funds for APPSN Transactions actually are debited from the account immediately, consistent with standard industry practice.

67.     Because these withdrawals take place upon initiation, then cannot be re-debited later.  But that is what KeyBank does when they re-debit the account during a secret batch posting process.

68.     In reality, KeyBank's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and at the time of settlement.  Then KeyBank makes that determination again, at settlement.

69.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds.  As such, KeyBank cannot then charge an Overdraft fee on such a transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

70.     At the moment a debit card transaction is getting ready to settle, KeyBank does something new and unexpected, during the middle of the night, during its nightly batch posting process.  Specifically, KeyBank releases the hold it had placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

71.     This furtive step allows KeyBank to charge Overdraft fees on transactions that it agreed not to—transactions that were authorized into sufficient funds, and for which KeyBank specifically set aside money to pay them.

72.     Third, as previously described, KeyBank charges multiple NSF fees for single transactions despite the fact that the Account Documents say KeyBank will charge only one NSF fee per transaction.

73.     This discrepancy between KeyBank's actual practices and the contract causes consumers to incur more Overdraft fees than they should.

74.     In sum, there is a wide gap between KeyBank's practices as described in the Account Documents and KeyBank's practices in reality.

**D.    KeyBank Abuses Contractual Discretion**

75.     KeyBank's treatment of debit card transactions to charge Overdraft fees is not simply a breach of the express terms of the Account Documents.  In addition, KeyBank exploits contractual discretion to the detriment of accountholders when it uses these policies.

76.     The term "to cover" a transaction is undefined. KeyBank uses its discretion to define "to cover" in a manner contrary to any reasonable, common sense understanding of that term.  In KeyBank's definition, a transaction is not "covered" even if KeyBank sequesters sufficient available funds for that transaction.

77.     Moreover, KeyBank uses its contractual discretion to cause APPSN Transactions to incur Overdraft fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions:

> If you choose to decline the Overdraft Services, ATM transactions and everyday debit card transactions that would cause your account to be overdrawn will typically be declined. However, overdrafts may still be paid at our discretion on checks, automatic bill payments and recurring debit card transactions.

https://www.key.com/personal/checking/overdraft-protection-options.jsp (last visited November 18, 2020)

78.     KeyBank uses all of these contractual discretion points unfairly to extract Overdraft fees on transactions that no reasonable consumer would believe could cause Overdraft fees.

**E.      Consumers Understand Debit Card Transactions Are Debited Immediately**

79.      The assessment of Overdraft fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions.  That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions).  If funds are immediately debited, then they are necessarily applied to the debit card transactions for which they are debited.

80.      KeyBank was and is aware that this is precisely how its accountholders reasonably understand debit card transactions to work.

81.      KeyBank well knows that many consumers prefer debit cards for these very reasons. Consumer research indicates that consumers prefer debit cards as a budgeting device because they don't allow debt like credit cards do, and because the money comes directly out of a checking account.[3]

82.      Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account.  Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *See* https://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card (last visited November 18, 2020).

83.      Further, Consumer Action informs consumers that, "Debit cards offer the convenience of paying with plastic without the risk of overspending.  When you use a debit card, you do not get a monthly bill.  You also avoid the finance charges and debt that can come with a credit card if not paid off in full."  *See* https://www.consumer-action.org/english/articles/understanding_debit_cards (last visited November 18, 2020).

---

[3] *See* https://www.chime.com/blog/why-debit-cards-are-the-best-for-budgeting/ (last accessed November 18, 2020).

84.     This is a large part of the reason that debit cards have risen in popularity.  The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM."[4]

85.     Not only have consumers increasingly substituted from cash to debit cards, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

86.     KeyBank was aware of a consumer perception that debit card transactions reduce an available balance in a specified order—namely, the order the transactions are actually initiated—and its account agreement only supports this perception.

### F.     Plaintiff's Experience

87.     On August 26, 2020, Plaintiff Urban was assessed an Overdraft fee in the amount of $38.50.  This is despite the fact that his account was not overdrawn, since his account balance showed that he had sufficient funds to pay for the transaction because of a pending debit that was added to the account before the transaction that led to the Overdraft fee.

88.     In June 2020, Plaintiff Urban was assessed two Overdraft fees in the amount of $38.50 each for two transactions.  The first transaction was made on his debit card and cleared on June 3, 2020 and was initiated on or prior to June 2, 2020—despite the fact that positive funds were deducted immediately for the transaction on which he was assessed an Overdraft fee.  The second transaction was a direct withdrawal for $125 that was made on June 2, 2020 after the first transaction.

89.     Indeed, the only reason the first debit card transaction that settled on June 3 incurred an Overdraft fee was because of the $125 direct withdrawal that Plaintiff Urban made *after* the debit card transaction had already been initiated.

---

[4] Maria LaMagna, Debit Cards Gaining on Case for Smallest Purchases, MARKETWATCH, Mar. 23, 2016, http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23

90.     Whether or not KeyBank was within its rights to charge an Overdraft fee on the $125 direct withdrawal, Plaintiff Urban disputes that KeyBank was authorized to charge an Overdraft fee on the prior-in-time debit card transaction.

91.     On March 2, 2020, Plaintiff Urban was assessed an Overdraft fee of $38.50 despite the fact that he had deposited enough money to cover the transaction prior to time the transaction was made.  This Overdraft fee came on a month where he was burdened with two other Overdraft fees.

92.     On November 7, 2019, Plaintiff Urban was accessed a $38.50 Overdraft fee for a $41.58 transaction.  Positive funds were deducted immediately for the transaction on which he was assessed Overdraft fees.

93.     Indeed, the only reason the transaction that settled on November 7 incurred an Overdraft fee was because of a $200 withdrawal that Plaintiff Urban made *after* the transaction that led to the overdraft had already been initiated.

94.     Additionally, prior to the $41.58 transaction, Plaintiff Urban had deposited $550 into his account which was enough to cover the transaction but was pending at the time Plaintiff Urban was accessed the November 7, 2019 Overdraft fee.

95.     On October 28, 2019, Plaintiff Urban was assessed a "Recurring Overdraft Service Charge" (ROSC) of $28.50 for carrying a negative balance for several days.  This is despite the fact that Plaintiff Urban's account would not have had a negative balance but for previous Overdraft fees that KeyBank accessed on his account.

96.     On October 23, 2019, Plaintiff Urban was assessed two Overdraft fees in the amount of $33.00 and $38.50 for two transactions, the second of which was a debit card transaction. Positive funds were deducted immediately for the debit card transaction on which he was assessed Overdraft fees.

97.     Indeed, the only reason the second debit card transaction that settled on October 22 incurred an Overdraft fee was because of a $650 withdrawal that Plaintiff Urban made *after* the debit card transaction had already been initiated.

98.     Whether or not KeyBank was within its rights to charge an Overdraft fee on the withdrawal transaction, Plaintiff Urban disputes that KeyBank was authorized to charge Overdraft fees on the prior-in-time transactions that were authorized into sufficient funds.

99.     KeyBank assessed Overdraft fees on the held transactions even though it had sequestered available funds for those transactions at the time they were authorized.

100.     On August 8, 2019, Plaintiff Urban was assessed at least one $38.50 Overdraft fee on a returned check made for a one-time payment.

101.     On June 4, 2019, Plaintiff Urban was assessed a ROSC for carrying a negative balance in his account for five days.  This is despite the fact that Plaintiff had already paid a $38.50 fee on the transaction that had overdrawn the account five days earlier.  This resulted in multiple Overdraft fees for the same transaction.  Additionally, the account was only overdrawn for the requisite period because an earlier ATM deposit was not credited until later in the same day that Plaintiff Urban was assessed an Overdraft fee.

102.     Many of these above fees were assessed for "overdrafts on ATM and everyday debit card transactions," despite the fact that Plaintiff Urban never asked to be enrolled in KeyBank's Overdraft Protection Program which allows KeyBank to "authorize and pay overdrafts on ATM and everyday debit card transactions."  Ex. A, Deposit Account Agreement and Funds Availability Policy.  This is against the explicit terms of its contract as KeyBank states that it "do[es] not authorize and pay an overdraft for Automated Teller Machine ("ATM") and everyday debit card transactions unless you ask [it] to," and that "[i]f you do not contact [it] to make an overdraft services selection, [it] will consider this to mean you do not want [it] to authorize and pay overdrafts on ATM and everyday debit card transactions."  *Id.*

103.     Plaintiff was harmed by all of these practices.  A complete evaluation of KeyBank's records is necessary to determine the full extent of Plaintiff's harm from these practices.

## **CLASS ALLEGATIONS**

104.     Plaintiff brings this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

105.    The proposed classes are defined as:

**Class 1: The Nationwide "Positive Balance" Class**

All United States residents who have or have had accounts with KeyBank who were charged Overdraft fees on transactions that were authorized into a positive available balance.

**Class 2: The Nationwide Multiple NSF Fee Class**

All KeyBank checking account holders in the United States who were charged multiple NSF Fees on the same item (the "Multiple NSF Fee Class").

**Class 3: The Nationwide Opt-In Class**

All United States residents who have or have had accounts with KeyBank who were charged Overdraft fees on ATM and everyday debit card transactions without having opted-in to Overdraft Services.

The classes are collectively referred to as the "Classes."

106.    Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

107.    Specifically excluded from the Classes are KeyBank, its parents, subsidiaries, affiliates, officers and directors, any entity in which KeyBank has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

108.    The members of the Classes are so numerous that joinder is impractical.  The Classes consist of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to KeyBank's records.

109.    The claims of the representative plaintiff are typical of the claims of the Classes in that the representative plaintiff, like all members of the Classes, was charged Overdraft fees on transactions that were authorized into a positive available balance and was charged multiple NSF Fees.  The representative plaintiff, like all members of the Classes, has been damaged by KeyBank's misconduct in that he has paid assessed unfair and unconscionable Overdraft and NSF Fees.   Furthermore, the factual basis of KeyBank's misconduct is common to all members of the

Classes, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.  Plaintiff Urban has suffered the harm alleged and has no interests antagonistic to the interests of any other members of the Classes.

110.   There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual members of the Classes.

111.   The questions of law and fact common to the Classes include:

a.   Whether KeyBank charged Overdraft fees on transactions that were authorized into a positive available balance;

b.   Whether KeyBank charged multiple NSF Fees on a single transaction;

c.   Whether KeyBank charged Overdraft fees on ATM and everyday debit card transactions to customers that did not opt-in to Overdraft Services;

d.   Whether KeyBank breached its own contract by charging Overdraft fees on transactions that were authorized into a positive available balance, by charging multiple NSF Fees on a single transaction, and/or by charging Overdraft fees on ATM and everyday debit card transactions to customers that did not opt-in to Overdraft Services;

e.   Whether KeyBank breached the covenant of good faith and fair dealing by charging Overdraft fees on transactions that were authorized into a positive available balance, by charging multiple NSF Fees on a single transaction, and/or by charging Overdraft fees on ATM and everyday debit card transactions to customers that did not opt-in to Overdraft Service;

f.   The proper method or methods by which to measure damages; and

g.   The declaratory, injunctive, and other equitable relief to which the Classes are entitled.

112.   Mr. Urban is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on

behalf of consumers and against financial institutions.  Accordingly, Mr. Urban is an adequate representative and will fairly and adequately protect the interests of the Classes.

113.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual class member's claim is small relative to the complexity of the litigation, and due to the financial resources of KeyBank, no class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Classes will continue to suffer losses and KeyBank's misconduct will proceed without remedy.

114.    Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

115.    Plaintiff suffers a substantial risk of repeated injury in the future.  Plaintiff, like all members of the Classes, is at risk of additional Overdraft fees on transactions that authorized into a positive available balance and NSF Fees on repeated reprocessing of transactions.  Plaintiff and the members of the Classes are entitled to injunctive and declaratory relief as a result of the conduct complained of herein.  Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain KeyBank from continuing to commit its unfair and illegal actions.

116.    KeyBank has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

# CAUSES OF ACTION

## COUNT I
### Breach Of Contract and Breach of the Covenant Of Good Faith And Fair Dealing
### (On Behalf Of The Classes)

117.    Plaintiff incorporates by reference each of the allegations set forth in the preceding paragraphs.

118.    Plaintiff and KeyBank have contracted for banking, account deposit, and checking services, as embodied in KeyBank's Account Agreement and related documentation.  KeyBank's Account Documents explicitly state that, when a customer lacks sufficient funds to cover a transaction, the bank may either: (a) authorize the transaction and charge a single Overdraft Fee; or (b) reject the transaction and charge a single NSF fee. KeyBank regularly violates its contractual promises by:

    a.    Charging Overdraft/NSF fees to customers when the balance in their checking accounts was sufficient to cover the transaction(s) at issue;

    b.    Charging multiple Overdraft/NSF Fees on a single transaction; and

    c.    Charging Overdraft fees for ATM and non-recurring debit card transactions to customers that did not opt-in to Overdraft Services.

119.    Every contract carries with it an implied covenant of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  The covenant requires faithfulness to an agreed common purpose and consistency with the justified expectations of the other party to a contract. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

120.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the

spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify contract terms, and interference with or failure to cooperate in the other party's performance.

121.    KeyBank has breached the covenant of good faith and fair dealing in the contract through its policies and practices as to overdraft/NSF fees as alleged herein.  Specifically, KeyBank harms consumers by exercising its contractual discretion in bad faith, even though that discretion is only vested in KeyBank, in a way which no reasonable consumer would anticipate.

122.    KeyBank abuses that discretion to take money out of customers' accounts without their permission and contrary to their reasonable expectations.

123.    Specifically, KeyBank regularly:

    a.  Reprocesses previously declined transactions, even when KeyBank knows a customer's account lacks sufficient funds;

    b.  Charges NSF/Overdraft fees upon reprocessing of previously declined transactions;

    c.  Charges Overdraft fees to customers when the balance in their checking accounts is sufficient to cover the transaction(s) at issue; and

    d.  Charges Overdraft fees for ATM and non-recurring debit card transactions to customers that did not opt-in to Overdraft Services.

124.    KeyBank thus uses its contractual discretion points to extract Overdraft and NSF fees on transactions that no reasonable consumer would believe could cause either.

125.    Plaintiff and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the Account Agreement.

126.    Plaintiff and members of the Classes have sustained damages as a result of KeyBank's breaches of contract and breaches of the covenant of good faith and fair dealing.

127.    Plaintiff and members of the Classes are thus entitled to relief in the form of damages, restitution, injunctive and other appropriate equitable relief.

//

//

//

## COUNT II
### Conversion
### (On Behalf Of The Classes)

128.    Plaintiff incorporates by reference each of the allegations set forth in the preceding paragraphs.

129.    KeyBank had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its own wrongful acts.

130.    KeyBank has wrongfully collected Overdraft fees from Plaintiff and the members of the Classes, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

131.    KeyBank has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiff and the members of the Classes, without legal justification.

132.    KeyBank continues to retain these funds unlawfully without the consent of Plaintiff or members of the Classes.

133.    KeyBank intends to permanently deprive Plaintiff and the members of the Classes of these funds.

134.    These funds are properly owned by Plaintiff and the members of the Classes, not KeyBank, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiff and the members of the Classes.

135.    Plaintiff and the members of the Classes are entitled to the immediate possession of these funds.

136.    KeyBank has wrongfully converted these specific and readily identifiable funds.

137.    KeyBank's wrongful conduct is continuing.

138.    As a direct and proximate result of this wrongful conversion, Plaintiff and the members of the Classes have suffered and continue to suffer damages.

139.    By reason of the foregoing, Plaintiff and the members of the Classes are entitled to recover from KeyBank all damages and costs permitted by law, including all property that KeyBank has wrongfully converted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying this action as a class action, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

(b)    For compensatory damages on all applicable claims and in an amount to be proven at trial;

(c)    For restitution on all applicable claims and in an amount to be proven at trial;

(d)    For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

(e)    For an order enjoining the wrongful conduct alleged herein;

(f)    For other appropriate injunctive and other equitable relief;

(g)    For costs;

(h)    For pre-judgment and post-judgment interest as provided by law;

(i)    For attorneys' fees under the account contracts, the common fund doctrine, and all other applicable rules and law; and

(j)    For such other relief as the court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: November 19, 2020        Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:   */s/ L. Timothy Fisher*
        L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596

Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Joseph I. Marchese (*Pro hac vice* Forthcoming)
888 Seventh Ave, Third Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jmarchese@bursor.com

*Attorneys for Plaintiff*

**EXHIBIT A**

# Deposit Account Agreement and Funds Availability Policy

**Effective August 14, 2020**
**KeyBank National Association**
**Member FDIC**



## TABLE OF CONTENTS

**PART I - DEPOSIT ACCOUNT AGREEMENT**
1. This Agreement
2. Opening Your Account
3. Deposits to Accounts
4. Collection of Items Deposited
5. Withdrawals
6. Posting Order; Payment of Items; Overdrafts; Substitute Checks
7. Stopping Payment
8. Account Disclosure and Fees
9. Signature Card and Resolutions; No Two Signer Accounts
10. Account Statements; Limitation On Time to Report Unauthorized Transactions, Forgeries and Errors
11. Time Account Certificates
12. Joint Personal Accounts; Survivorship Accounts
13. Payable on Death Accounts
14. Fiduciary and Custody Accounts
15. Powers of Attorney
16. Closing Accounts
17. Inactive Accounts/Unclaimed Funds
18. Death/Incompetence

19. Our Right of Set-off
20. Adverse Claims; Interpleader; Legal Process
21. Assignment; Pledge
22. Waiver of Notices
23. Check Cashing
24. Addresses; Notices
25. Arbitration Provision
26. Applicable Law
27. Amendments; Non-Waiver; Severability
28. Credit Reports
29. Disclosure of Account Information
30. Electronic Authentication of Signature; Electronic Records
31. Enforceability of Electronic Records and Signed Documents

**PART II - FUNDS AVAILABILITY POLICY**

## PART I - DEPOSIT ACCOUNT AGREEMENT

This Agreement governs all Accounts you maintain with us. As used in this Agreement, "we," "us," "our," and similar terms mean KeyBank National Association, Cleveland, Ohio, its respective parents, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, employees, officers and directors. "You," "your," and similar terms mean each person listed on our records as the owner of the Account and any person you authorize to sign or act on your behalf.

**1. This Agreement.** This Agreement is the contract between you and us that governs all Personal and Business Accounts. You agree to its terms by opening an Account. You should read this Agreement carefully and keep a copy for your records. From time to time we may offer new types of Accounts and may cease offering some types of Accounts. This Agreement governs all of these new types of Accounts, and continues to govern any Accounts you may have that we no longer offer. As used in this Agreement:

- **Account** means all Checking, Savings and Time Deposit Accounts. "Personal Accounts" means Accounts we classify from time to time as personal and offer primarily to consumers for personal, family or household purposes. "Business Accounts" means all other Accounts and includes Accounts we offer from time to time primarily to businesses, organizations, public entities, commercial and non-profit enterprises, corporations, partnerships, limited liability companies, sole proprietors and associations.
- **Checking Accounts** means all Accounts we designate from time to time as Checking Accounts.
- **Savings Accounts** means all Accounts we designate from time to time as Savings Accounts.
- **Time Accounts** means all Accounts that you deposit with us for a specified period of time and we classify from time to time as time deposits.

Additional terms apply to Time Accounts, retirement Accounts and to some other types of Accounts. You receive a copy of these other terms when you open your Account, and you agree to comply with them. Some Accounts, such as retirement Accounts and uniform gifts or transfers to minors custodial Accounts, are also subject to the terms and conditions imposed by specific laws governing such types of Accounts.

Interest bearing Checking Accounts may be opened and maintained by any individual or business entity.

**2. Opening Your Account.** To open and maintain your Account you must complete the proper forms and provide us with any other documents, information or items that we may require to establish and maintain an Account with us. These requirements include acceptable forms of identification including but not limited to a thumbprint in certain states, any required minimum deposit, and your Taxpayer Identification Number. If these items are not provided within a reasonable period of time, we may close your Account as described in Section 16. If you open a non-personal Account with us, you must certify the adoption of resolutions acceptable to us that authorize us to transact business with your designated representative(s).

If you open a fiduciary Account, other documents required depend on the type of Account being opened. For example, if you open an estate Account you need certified court appointment papers naming you as executor or administrator of the estate. If you are a trustee under a written trust agreement, you must show us a copy of the trust agreement specifying the beneficiary, the trustee, the trust property, and verifying the trustee's authority to open the Account. Federal tax laws require us to obtain from each Account owner a certification of the owner's Taxpayer Identification Number and whether the owner is subject to backup withholding. You must notify us if your Taxpayer Identification Number is incorrect or if you become subject to backup withholding. We must withhold some of the interest payable on your Account if you fail to give us a correct Taxpayer Identification Number or otherwise become subject to backup withholding. It is our policy not to open an Account unless you certify your Taxpayer Identification Number or have applied for a Taxpayer Identification Number. If you fail to provide an appropriate Taxpayer Identification Number, we may close your Account.

**Standard Overdraft Services that may come with your Account.** You may make your selection as described below at the time you open your Account or any time thereafter.

**THE FOLLOWING APPLIES TO CONSUMER ACCOUNTS ONLY**
In our discretion, we may decide to pay/process a check, recurring debit card transaction, preauthorized automatic debit, telephone-initiated transfer, electronic transfer or other item as a service to you even if the available balance in the Account on which it was drawn/debited is not sufficient to cover the transaction. When we do so the payment may create an "overdraft" in your Account. Overdrafts can also result from other circumstances, such as when a check deposited by you is returned to us unpaid. *If you do not want us to pay/process any of these items as a service to you when the available balance in the Account on which it was drawn/debited is not sufficient to cover the transaction, please contact your KeyBank branch or your Financial Advisor.*

We do not authorize and pay an overdraft for Automated Teller Machine ("ATM") and everyday debit card transactions unless you ask us to. Please review the Overdraft Services Consent Form provided. *If you want us to authorize and pay overdrafts on ATM and everyday debit card transactions, at our discretion, you may call 1-888-725-7606, sign on to Online Banking and select the Overdraft Services Options link on the Self Service tab, visit any KeyBank branch or contact your Relationship Manager.* Normal overdraft fees will likely apply. If you do not contact us to make an overdraft services selection, we will

consider this to mean you do not want us to authorize and pay overdrafts on ATM and everyday debit card transactions. On a joint Account, any account owner can make an overdraft services selection that will apply to these transactions.

You agree to pay us the full amount of any overdraft on your Account immediately upon demand, together with any additional fee we charge.

On joint Accounts, each of you is jointly and severally liable for overdrafts. This means we can collect the full amount of the overdraft, plus any fees, from either of you, even if you did not create the overdraft, or collect from all of you.

**THE FOLLOWING APPLIES TO BUSINESS ACCOUNTS ONLY**
In our discretion, we may decide to pay/process a check, ATM withdrawal, debit card transaction, preauthorized automatic debit, telephone-initiated transfer, electronic transfer or other item as a service to you even if the available balance in the Account on which it was drawn/debited is not sufficient to cover the transaction. When we do so the payment may create an "overdraft" in your Account. Overdrafts can also result from other circumstances, such as when a check deposited by you is returned to us unpaid. You agree to pay us the full amount of any overdraft on your Account immediately upon demand, together with any additional fee we may charge. *If you do not want us to pay/process any of these items as a service to you when the available balance in the Account on which it was drawn/debited is not sufficient to cover the transaction, please contact your KeyBank branch or your Financial Advisor.*

**Wireless Express Consent (applies to Consumer Accounts only)**
By providing a telephone number for a cellular telephone, other wireless device, or a landline number that was later converted to a wireless device, you are expressly consenting to receiving communications at that number, including, but not limited to, prerecorded or artificial voice message calls, text messages, and calls made by an automatic telephone dialing system from KeyBank National Association and its affiliates and agents. This express consent applies to each such telephone number that you provide to us now or in the future and permits such calls regardless of their purpose. These calls and messages may incur access fees from your cellular provider.

**3. Deposits to Accounts.** All deposits you make are subject to "proof" by us. This means we reserve the right to review the cash, checks or other items deposited to confirm the amount of the deposit and that all checks and other items are properly payable. We can correct any errors we find. For example, if you made an error in adding up the amount of your deposit, we can correct your Account records to reflect the actual amount deposited. We can correct errors even if we gave you a receipt for the incorrect amount or already posted the incorrect amount to your Account. We can supply your endorsement if it is missing from any check or other item you deposit. If a check or other item was not properly payable, we can decline to credit your Account for the amount of the check or other item.

We reserve the right to refuse to accept any check or other item to be deposited. In particular, we will not accept deposits of any checks or other instruments that cannot be mechanically processed by our check/item processing hardware and software, or otherwise be processed and paid in accordance with our standard practices or with standard check/item collection practices of banks in general (e.g. checks in the amount of $100 million or greater).

When we credit your Account for a check or other non-cash item you deposit, the credit is conditional. This means we can revoke the credit if the check or other item is dishonored or not paid for any reason, even if we are unable to return, or there is any delay in returning, the unpaid check or other item to you. We can also revoke a credit for any other reason if permitted under applicable law. You agree to waive the requirements of any law limiting the time within which we must revoke a credit or requiring us to notify you of nonpayment, dishonor or the revocation of a credit.

Some of our branches have established "cut-off" times (e.g. 2:00 p.m.). Deposits received, withdrawals made and other transactions occurring prior to the cut-off time each business day will be posted to Accounts as of that day. Deposits received, withdrawals made and other transactions occurring after the cut-off time will be posted to Accounts as of the next business day. Deposits received, withdrawals made and other transactions occurring on any non-business day will be posted as of the next business day.

Deposits containing 500 or more checks may be subject to a branch specific cut-off time. If a cut-off time applies it will be posted at the branch. Deposits of 500 or more checks made at a branch before the posted cut-off time will be considered received that business day. Deposits of 500 or more checks made at the branch after the posted cut-off time will be considered a next-business day deposit and processed accordingly. Cash is not subject to the cut-off time and will be verified and credited the same-day. The cut-off time may vary by location but will not be earlier than 2:00 p.m. local time.

Items sent to us in the mail for deposit are not considered to have been received by us until delivered to us by the U.S. Postal Service. Items placed in one of our night depository boxes or similar boxes at our facilities are not considered received until we remove them (which usually occurs by 9:00 a.m. on business days). Items delivered to us electronically are not considered to have been received by us until accepted by us. Until we receive them, you bear the risk that deposits will be lost, stolen or destroyed.

We make the funds you deposit available for withdrawal in accordance with our Funds Availability Policy, which accompanies this Agreement. Until the funds become available, you cannot withdraw them or write checks against them and we can refuse to permit withdrawals or pay checks if the funds to do so are not yet available.

You may not deposit remotely created checks (items not bearing the maker's signature, but purporting to be authorized by the maker) to an account with us without our prior, express written consent. This provision does not apply to checks created on your behalf by the paying bank. If you deposit remotely created checks with us, you agree that we may withhold a portion of the proceeds of such drafts or other funds in your Accounts in a reserve account, in an amount that we reasonably believe may be needed to cover future chargebacks, returned items, and/or claims that such drafts were unauthorized. You grant us a security interest in the reserve account. Unless we agree otherwise in writing with you, reserve funds shall not bear interest. Our rights to charge your Account for returned remotely created checks will not be limited by the balance or existence of any reserve. Our rights with respect to the reserve, as well as the security interest granted to us, shall survive the termination of this Agreement. We may discontinue accepting remotely created checks at any time without cause or prior notice.

**Restriction on Deposit of Substitute Checks.** You are prohibited from depositing or cashing any substitute check with us that was not previously created by a financial institution and then transferred to you, unless you have signed a separate service agreement with us that governs this process. Please contact your Account Officer to discuss these services for business customers in greater detail. In the event you deposit a substitute check without our prior authorization and we subsequently process the substitute check, you assume all risk of losses, damages, liabilities and other obligations that may arise as a result of your action, and you agree to indemnify and save us harmless in the manner described in the section titled **Adverse Claims; Interpleader; Legal Process** from all losses, damages, liabilities, obligations, expenses and costs that we incur as a result of your action. Substitute checks created by us or another financial institution that are returned to a customer unpaid (i.e. a substitute check of a deposited item returned unpaid) may be redeposited in accordance with applicable rules, regulations and laws.

**IMPORTANT NOTICE TO BUSINESS CUSTOMERS REGARDING INTERNET GAMBLING.**

The Unlawful Internet Gambling Enforcement Act (UIGEA) prohibits any person or other entity from making or accepting a Restricted Transaction as defined in UIGEA and Regulation GG. All Restricted Transactions at KeyBank are prohibited. We have established certain policies and procedures designed to identify and block, or prevent payment of, any Restricted Transaction involving your Account(s) with us. Also we may at our sole discretion block or prevent payment of all Internet gambling transactions without notice to you. You hereby acknowledge and agree that we shall have no obligation or liability of any kind for blocking, or failing to block, any Restricted Transaction or other Internet gambling transaction.

**4. Collection of Items Deposited.** When you deposit or ask us to pay a check or other item that is not drawn on us, we act as your collecting agent to obtain payment for you. We may forward these items directly or indirectly to any other bank, including the bank on which the item is drawn. Items and their proceeds may be handled by any Federal Reserve Bank in accordance with applicable Federal Reserve rules, by clearinghouses in accordance with their rules, and by other banks in accordance with common bank practices. You agree that all rules, regulations and practices of Federal Reserve Banks and clearinghouses also apply to the payment and collection of the checks and items you give us. When we act as your collecting agent, we assume no duties or

responsibilities (other than to use ordinary care), and we are not responsible for the actions of any Federal Reserve Bank or other bank or clearinghouse that handles the check or item during the collection process. You agree to reimburse us for any loss we may sustain (or damages we must pay another person for their loss) resulting from the condition of any check or item you deposit. This includes illegible and missing signatures, numbers or other information, instructions and disclaimers on the front or back of the check or item, and use of the space on the back of checks reserved for endorsement by banks that handle the check for collection.

**5. Withdrawals.** Federal law requires us to impose special rules limiting withdrawals from some Accounts. The rules differ depending on the type of Account.

- **Checking Accounts.** Checking Accounts consist of two subaccounts: a checking subaccount and a savings subaccount. All of the provisions of this Agreement and all of the terms and conditions governing your Checking Account apply to the Account as a whole without reference to the subaccounts, except as provided in this section. If your Checking Account earns interest, the interest rate will apply to both subaccounts. If your Checking Account does not earn interest, no interest will be paid on either subaccount.

  We transfer funds in the checking subaccount to the savings subaccount when such funds are not needed to pay checks, debits, or other items drawn on your Checking Account. We may sweep the entire balance into the savings subaccount during the weekend when no items will post to your Checking Account. We may also establish a threshold balance in the checking subaccount and transfer any funds in excess of the threshold balance to the savings subaccount. All checks, debits and other items will be paid from balances credited to the checking subaccount. All deposits and credits will be credited to the checking subaccount. We periodically reallocate the balances between the subaccounts to make funds available in the checking subaccount to pay checks, debits and other items drawn on your Checking Account. These transfers will be the only transactions on the savings subaccount. We will not allow more than six transfers per monthly statement period from the savings subaccount and, if a sixth such transfer is made, all funds in the savings subaccount will be transferred to the checking subaccount for the remainder of the monthly statement period.

  In accordance with federal law, we reserve the right to require seven days' prior notice of any transfer from a Money Market Checking Account (Negotiable Order of Withdrawal). Subject to those limitations, you can make an unlimited number of withdrawals in person or by check and arrange for preauthorized transfers and withdrawals, including telephone transfers.

- **Savings Accounts.** Savings Accounts have no check-writing privileges unless we specifically tell you that you may write checks on your Account. On Savings Accounts, you may withdraw money in person at our branches, arrange for preauthorized transfers and withdrawals and, if your Savings Account has check-writing privileges, write checks, subject to the following limitation: during any monthly statement period, you are permitted or authorized to make no more than six transfers and withdrawals to another KeyBank account of yours (including a transaction account) or to a third party by means of a preauthorized or automatic transfer, or telephonic (including data transmission) agreement, order or instruction, or by check, draft, debit card or similar order payable to third parties, including transfers to third parties made through an automated teller machine or telephone and point of sale transactions posted to your Account. You can make an unlimited number of withdrawals in person at an ATM or at any of our branches. You can also make an unlimited number of transfers through an ATM from one Checking or Savings Account to another Checking or Savings Account. We reserve the right to require seven (7) days prior written notice of any intended withdrawal (whether made in person, by check, by telephone or by preauthorized transfer or withdrawal).

- **Time Accounts.** When you open a Time Account, you are agreeing to keep your funds on deposit with us in that Account until the maturity date. We are not required to allow you to withdraw any or all of the funds in the Account until the maturity date. If we do allow a withdrawal, we may require you to withdraw the full balance in the Account and pay an early withdrawal penalty. Unless the disclosures given when you open a Time Account provide otherwise, you cannot change the terms of this Account, make additional deposits or partial withdrawals either during the term or during any grace period after maturity.

- **Retirement Accounts.** Most of the restrictions on withdrawals described above will apply to Accounts that are retirement Accounts. Certain other restrictions will also apply. Refer to the documents governing your retirement Accounts for a complete description of these restrictions.

For Accounts on which we have reserved the right to require prior notice of withdrawal, if we exercise that right we can refuse to allow any withdrawal for which proper notice was not given. This means, for example, that we can refuse to pay checks written against the Account. If we take these actions, we are not liable to you for wrongful dishonor, for failure to release your funds or for any other reason.

For Savings Accounts, if you exceed any of the limits on transactions, withdrawals, or checks, we may close your Account or convert your Savings Account to a Checking Account. If we convert your Account, you agree to pay all fees we charge on Checking Accounts and comply with all other terms and restrictions applicable to Checking Accounts.

You authorize us to transfer money from one Checking Account or Savings Account to another Checking Account or Savings Account, or to a third party, when we receive instructions to do so from you over the telephone. You agree that we may record any of your telephone calls to us when making a telephone transfer.

If we ask, you must provide us with identification or other documents or information acceptable to us in order to withdraw funds from your Account. If we ask, you also must sign a document acknowledging that you received the funds withdrawn.

You must use only the forms made available through us, or other forms approved by us, when making deposits to, withdrawals from, or writing checks on, your Account. All forms of checks must be standard size, bear your name and address, our name and address, and the appropriate routing/transit and Account numbers, and be capable of being processed by our MICR check/item processing hardware and software.

**6. Posting Order; Payment of Items; Overdrafts; Substitute Checks.** We may change the posting order at any time with notice to you. We establish different processing groups that are based on the date and/or time a transaction was initiated such as transactions made by you after normal business hours or items initiated by us. For example, consumer or small business account transactions that you make on a Saturday or Sunday are posted prior to a transaction you make during normal business hours on the next business day.

The processing groups established depend on your Account type. For all consumer (excluding Nursing Home Direct Deposit and Key Pre-Need Funeral Trust) and the following small business Account types, KeyBank Basic Business Checking, Key Business Gold Money Market Savings, Key IOLTA, Key Interest on RE Trust, Non-IOLTA Lawyer Trust Account, Key Business Saver, Key Business Reward Checking, KeyBank Business Interest Checking, Key Business Silver Money Market Savings, Key Business Basics Checking, Key Business MajorSaver Money Market Savings, Key Business Platinum Money Market Savings, and Key Business Money Market Savings, cutoff times were established to classify transactions as either prior day or current day. This results in two processing groups: (1) the *prior day* transactions processing group and (2) the *current day* transactions processing group. Transactions that are classified as prior day include but are not limited to the following:

- Transactions initiated by you in a branch after the branch's business day cutoff; including branch transactions conducted on Saturday.
- ATM, debit card PIN/POS, telephone, and online banking transactions conducted between 7:00 p.m. and midnight local time (local time is based on the state where you opened your Account) on the previous day; including transactions conducted between 7:00 p.m. Friday through midnight Sunday local time.
- Debit card signature transactions with an authorization date (when available, otherwise we will use the settlement date) that is prior to the current processing date are considered prior day transactions.
- Mobile Banking deposits made on a previous day to a consumer Account
  between 7:00 pm. and midnight local time to a consumer Account opened in AK;
  between 8:00 pm and midnight local time to a consumer Account opened in OR or WA;

between 9:00 pm and midnight local time to a consumer Account opened in CO, ID or UT
between 11:00 pm and midnight local time to a consumer Account opened in IN, KY, MI, OH, FL, NY, ME or VT
including Mobile Banking deposits conducted between these time periods on Friday through midnight Sunday local time (local time is based on the state where you opened your Account).

All transactions not classified as prior day are considered current day transactions. Prior day transactions will post using the current business day's processing date.

The following chart reflects the current posting order for categories within the processing groups for all consumer (excluding Nursing Home Direct Deposit and Key Pre-Need Funeral Trust) and certain small business (refer to list above) Account transaction types. Certain limited exceptions may apply.

| Processing Group | Primary Posting Categories | Examples of Transactions included in Posting Categories | Sort Order |
|---|---|---|---|
| **Prior Day** | Pending Credits | Reversed signed debit card purchase | Low to high dollar amount |
| | Credits | ATM deposit, branch deposit | Low to high dollar amount |
| | Overdraft Item and Return Item Charges | Charges from overdraft/return items occurrences from the previous day | Low to high dollar amount |
| | Branch Withdrawals | | Low to high dollar amount |
| | ATM & Debit Card transactions (pending & settled) | ATM withdrawal, pending signed debit card purchase, posted signed debit card purchase | Authorization date/time; if no authorization date/time, then by settlement date/time; if no settlement date/time, then low to high dollar amount |
| | Checks | | Check number; if no check number, then low to high dollar amount |
| | All Other Debits | ACH debit, E-Check, online banking bill pay | Low to high dollar amount |
| **Current Day** | Pending Credits | Reversed signed debit card purchase | Low to high dollar amount |
| | Credits | ATM deposit, branch deposit | Low to high dollar amount |
| | Wire Transfers | | Low to high dollar amount |
| | Branch Withdrawals | | Low to high dollar amount |
| | ATM & Debit Card transactions (pending & settled) | ATM withdrawal, pending signed debit card purchase, posted signed debit card purchase | Authorization date/time; if no authorization date/time, then by settlement date/time; if no settlement date/time, then low to high dollar amount |
| | Checks | | Check number; if no check number, then low to high dollar amount |
| | All Other Debits | ACH debit, E-Check, online banking bill pay | Low to high dollar amount |
| | OD Protection Transfer | Automatic advance from Cash Reserve Credit (credit), Automatic Pymt. to Cash Reserve Credit (debit) | As applicable |
| | Service charges* | Overdraft Item Charge, Maintenance Service Charge | As applicable |

*Does not include the Excessive Withdrawal Fee which will post with the associated withdrawal. Refer to the Deposit Account Fees and Disclosures for details.

For all other business account type transactions we will post items from highest dollar amount to lowest dollar amount within certain categories. The following is the current posting order for all other business account type transactions. Certain limited exceptions may apply.

**We post all transactions as current day transactions in the following order:**
Pending Credits, Pending Debits, Credits, Wire Transfers, other types of transfers, Debits All Other

Withdrawals by check are permitted only on Checking Accounts and on Savings Accounts with check-writing privileges. You agree that, when a check or other item drawn on or payable from your Account is presented for payment, we can disregard any legends on the check (such as "void after 60 days", "paid in full" or "void over $100"), any restrictive endorsements or other information, instructions and disclaimers that would limit or tend to limit the negotiability of the check or other item. In our discretion, we may process or decline to process any check more than six months old. We can also pay photocopies of checks accompanied by a representation that the original was lost or destroyed. You also agree that we can pay checks before the date set forth on the check (i.e. "post dated checks"). We have this right even if you give us notice that you wrote a post dated check. In order to prevent a post dated check from being paid, you must give us a valid stop payment order.

We may debit your Account on the day an item is presented by electronic or other means, or at an earlier time based on notification received by us that an item drawn on your Account has been deposited for collection in another financial institution. We pay checks or other items from the funds that we determine, in our discretion, are "available" for withdrawal from your Account. Some or all of the funds in your Account may not be "available" at the time a transaction

posts. For example, for point-of-sale transactions the funds in your Account that are "available" may be reduced by the amount of any transaction for which the merchant/payee receives authorization from us, whether or not the transaction has been presented for payment. We may consider such pending transaction for the purpose of determining the amount of funds in your Account to be used to pay other items presented against your Account. If the available balance in your Account is not sufficient to cover other items presented against your Account, you may incur an Overdraft Item (OD) Charge or a Return Item Charge. Furthermore, if the authorized transaction posts to the Account when there are no longer sufficient available funds to cover it, you may incur an additional OD Charge.

In addition, funds you deposit may not be immediately available under our Funds Availability Policy. Likewise, we may have placed a "hold" on some or all of the funds in your Account because, for example, we reasonably believe a court order has restrained us from releasing funds to you. We will not be liable to you for damages, wrongful dishonor, or additional fees incurred if we dishonor or decline to pay a check or other item drawn on or payable from your Account if the Account has insufficient available funds to pay the check or other item. We do not have to check the balance in your Account more than once to determine if there are available funds. If an item is presented for payment against your Account and is returned for any reason more than twice, we reserve the right to cease any further negotiation of the item.

If you make a check or other item payable to the order of more than a single payee, and the check or item is presented to us for payment without the endorsement of one or more payees, you authorize us to pay the item and charge your Account. In such event, we will assist you, to the extent we deem practicable, in obtaining any such missing endorsement(s), or any reimbursement to which you may be entitled.

### What is a substitute check?
To make check processing faster, federal law permits banks to replace original checks with "substitute checks." These checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a substitute check states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a substitute check as proof of payment just like the original check.

Some or all of the checks that you receive back from us may be substitute checks. This notice describes rights you, as a consumer, have when you receive substitute checks from us. The rights in this notice do not apply to original checks or to electronic debits to your Account. However, you have rights under other law with respect to those transactions.

### THE FOLLOWING APPLIES TO CONSUMER ACCOUNTS ONLY

### What are your rights as a consumer regarding substitute checks?
In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a substitute check is posted to your Account (for example, if you think that we withdrew the wrong amount from your Account or that we withdrew money from your Account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your Account and fees that were charged as a result of the withdrawal (for example, bounced check fees).

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the substitute check, whichever is less. You also are entitled to interest on the amount of your refund if your Account is an interest-bearing Account. If your loss exceeds the amount of the substitute check, you may be able to recover additional amounts under other law.

If you use this procedure, you may receive up to $2,500 of your refund (plus interest if your Account earns interest) within 10 business days after we received your claim and the remainder of your refund (plus interest if your Account earns interest) not later than 45 calendar days after we received your claim.

We may reverse the refund (including any interest on the refund) if we later are able to demonstrate that the substitute check was correctly posted to your Account.

### THE FOLLOWING APPLIES TO CONSUMER ACCOUNTS ONLY

### How should you as a consumer make a claim for a refund?
If you believe that you have suffered a loss relating to a substitute check that you received and that was posted to your Account, please contact us by calling 1-800-KEY2YOU (1-800-539-2968) (TDD 1-800-762-4833), or write: KeyBank, Customer Disputes, 555 Patroon Creek Blvd., Albany, NY 12206. You must contact us within 40 calendar days of the date that we mailed (or otherwise delivered by a means to which you agreed) the substitute check in question or the Account statement showing that the substitute check was posted to your Account, whichever is later. We will extend this time period if you were not able to make a timely claim because of extraordinary circumstances.

Your claim must include-

- A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect);
- An estimate of the amount of your loss;
- An explanation of why the substitute check you received is insufficient to confirm that you suffered a loss; and
- A copy of the substitute check and the following information to help us identify the substitute check: (identifying information, for example the check number, the Account number, your name, the name of the person to whom you wrote the check, the amount of the check and the posting date the check appears on your statement).

If you tell us orally, we may require that you send us your request for a refund in writing by the 10th business day after the banking day on which the bank received your oral notice. We will tell you the results of our investigation within 10 business days after we hear from you. If we need more time, however we may take up to 45 calendar days to investigate your claim. If we ask you to put your request for a refund in writing and we do not receive it within 10 business days, we may not credit your Account. We will tell you the results no later than the business day after the banking day we complete our investigation. If we decide your claim is not valid, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

**7. Stopping Payment.** You can ask us to stop payment on a check drawn on your Account. In order to place a stop payment request, you must inform us of the exact amount of the item, the number of the check, the date of the check, the Account number, and any other information we may request. A stop payment confirmation will be mailed to you. You must review the specific details on the confirmation for accuracy, and call us immediately if any of the information is not accurate. A stop payment request is effective for only six (6) months, unless you specifically request the stop payment be effective for 12 months. You may renew a stop payment prior to its expiration. Refer to the Deposit Account Fees and Disclosures for stop payment fee details. We are not liable for payment of a check or other item if a stop payment request has expired and not been renewed. In some states and under certain limited circumstances, you may stop payment on official checks and on certified checks.

We are not liable for failing to stop payment if you have not given us sufficient information or if your stop payment request comes too late for us to act on it. We are entitled to a reasonable period of time after we receive your stop payment request to notify our employees and take other action needed to stop payment. You agree that "reasonable time" depends on the circumstances but that we will have acted within a reasonable time if we make your stop payment request effective by the end of the next business day following the business day on which we receive your stop payment request. If we stop payment, you agree to defend and pay any claims raised against us as a result of our refusal to pay the check or other item on which you stopped payment.

If we recredit your Account after we have paid a check or other item over a valid and timely stop order, you agree to sign a statement describing the dispute you have with the person to whom the check or item was made payable. You also agree to transfer to us all of your rights against the payee and any other holder, endorser or prior transferee of the check or item and to cooperate with us in any legal action taken to collect against the other person(s).

If we are liable for inadvertently paying your check over a stop payment order, you must establish the amount of your loss caused by our payment of the check. We will pay you only the amount of the loss, up to the face amount of the check.

You may request us to stop payment of electronic funds transfers from your Account. You must refer to other agreements and disclosures for information regarding stopping payment on electronic funds transfers.

**8. Account Disclosure and Fees.** When you opened your Account, we gave you disclosures containing additional terms and conditions relating to your Account and listing fees that may be payable to us. You agree to comply with the terms and conditions disclosed and to pay us the fees and charges imposed by us on your Account. We can deduct any or all these fees and charges from your Account. We are not liable for dishonoring or declining to pay a check or other item drawn on or payable from your Account if your Account does not contain sufficient "available" funds as a result of our deducting fees and charges from your Account. We can change these fees at any time. We will give you prior notice of the change if we are required to do so under applicable law.

All fees are "deposit account service charges" under Title 12, Code of Federal Regulations, Section 7.4002 (12 C.F.R. section 7.4002). These fees are assessed for the inconvenience and additional administrative resources that we incur or require to provide the associated services. All fees charged in connection with an overdraft are designed to deter you from overdrawing your account and/or allowing such overdrafts to continue and thus to maintain the safety and soundness of our operations. No loan or extension of credit is or is intended to be established by our honoring of an overdraft. On certain Accounts, an overdraft line of credit is available. Please contact us for additional information if you are interested in an overdraft line of credit.

**9. Signature Cards and Resolutions; No Two Signer Accounts.** We are entitled to rely upon and treat as genuine the names, titles and signatures shown on any Account signature cards and Account Express Plan, or other written documentation acceptable to us, delivered by you or your officers, employees or agents on your behalf, unless you notify us otherwise in writing. If we require you to deliver certified copies of resolutions or sign our depository resolutions to open an Account, we are entitled to rely upon such resolutions and certifications, without investigation by us, unless you or your authorized representative notify us otherwise in writing.

You agree that we can pay checks drawn on your Account and made payable to any of your officers, partners, employees or agents and we may cash and pay such checks without inquiring about the authority of the payee or person who signed the check on your behalf. Subject to the statement review provisions contained in Section 10 below, if the signature cards or resolutions related to your Account are unavailable for any reason, you agree that we can rely upon the titling contained in your most recent Account Statement for purposes of determining the ownership of the Account.

We do not offer Accounts on which two signatures are required for a check or other withdrawal. Notwithstanding any provisions to the contrary on any signature card or other agreement you have with us, you agree that if any Account purports to require two or more signers on items drawn on the Account, such provision is solely for your internal control purposes and is not binding on us. If more than one person is authorized to write checks or draw items on your Account, you agree that we can honor checks signed by any authorized signer, even if there are two or more lines on the items for your signature and two signatures are required.

**10. Account Statements; Limitation on Time to Report Unauthorized Transactions, Forgeries and Errors.** You should review and balance your Account statements promptly after you receive them or, if we are holding them for you, promptly after we make them available to you. If you don't receive an Account statement by the date when you usually receive it, call us at once. We will not mail a paper monthly statement if there is no activity on the account during that statement period. However, you will receive a deposit account statement quarterly, even if there is no activity during that period. This is not applicable to you if you currently receive quarterly statements, a monthly paper combined statement or an online electronic monthly statement. You must review your statements to make sure that there are no errors in the Account information. You agree that if you give out your Account number to a third party, such act authorizes the recipient of the information to initiate debits to your Account, whether or not you have authorized the particular debit.

On Accounts with check-writing privileges, you must review your statement and any canceled checks we send you and report unauthorized transactions including forgeries, alterations, missing signatures, amounts differing from your records, or other information which might lead you to conclude that a transaction was not authorized or a check was forged or that, when we paid the check, the proper amount was not paid to the proper person. You have this duty even if we do not return checks to you or we return only an image of the check. You should notify us as soon as possible if you think there is a problem.

If we are holding your Account statements for you at your request, the statements become "available" on the day they are available for you to pick up. This means, for example, that the period in which you must report any problem with an Account begins on the day we make the statement available, even if you do not pick up the statement until later.

Because of the high volume of items we must process and the largely automated nature of such processing, you agree that we will not be considered to have failed to exercise ordinary care if we do not manually examine all items. All checks, withdrawal forms, and deposit slips must be on forms obtained through us or which we approve in advance. You are responsible for verifying the accuracy of all information on such forms. Our liability, if any, for any printing errors on forms obtained through us is limited to the cost of replacement of such forms. We are not responsible for errors or losses you may incur due to improper printing on forms not obtained through us or approved by us in advance.

If you choose to use a facsimile signature device, you agree that we are not liable for honoring checks bearing facsimile signatures or facsimile endorsements. You agree to indemnify us and hold us harmless from any claims related to the use of a facsimile signature device. This means we will not recredit your Account if your facsimile signature is forged or use of the facsimile device was unauthorized.

If you have made arrangements with us to review electronic information about checks presented for payment, we are not liable for any errors or problems with checks you authorize us to pay. You agree that we will not be considered negligent in paying checks presented to us electronically through normal banking channels prior to receiving the actual check or paying checks even if we do not check the signature on the checks we pay.

If you assert against us a claim that a transaction was not authorized or an item was not properly payable because, for example, the item was forged or an endorsement was forged, you must cooperate with us and assist us in seeking criminal and civil penalties against the person responsible. You must file reports and complaints with the appropriate law enforcement authorities and promptly provide us with copies of such reports and complaints. You must also give us a statement, under oath, about the facts and circumstances relating to your claim. If you fail or refuse to do these things, we will consider that you have ratified the defect in the item and agree that we can charge the full amount of the item to your Account.

**You must notify us as soon as possible after receiving your Account statement if you believe there is an error or irregularity of any kind, including any unauthorized transaction or signature, lack of signature or alteration. You agree that thirty (30) days after we mailed a statement (or otherwise made it available to you) is a reasonable amount of time for you to review your Account statement and report any errors or other irregularities. In addition, by law we may be relieved of any potential liability for multiple unauthorized signatures or alterations by the same wrongdoer if you do not notify us in writing within thirty (30) days after your statement containing the first such irregularity was mailed or otherwise made available to you. Similarly, by law we may be relieved of any potential liability for losses arising due to your negligence. You agree that failure to report any error or irregularity in writing within thirty (30) days after we mailed your statement (or otherwise made it available to you) shall preclude you from recovering any amounts from us. No legal proceeding or action shall be brought by you against us to recover any amount alleged to have been improperly paid out of the Account (as well as related losses) due to an unauthorized transaction or signature, alteration or other defect unless (1) you have given the written notice provided above, and (2) such action shall have been commenced within the time required by applicable law. Transactions involving electronic funds transfers may be governed by the Electronic Fund Transfer Act and may be subject to KeyBank's Terms and Conditions for Electronic Fund Transfer Transactions.**

You may not deposit remotely created checks (items not bearing the maker's signature, but purporting to be authorized by the maker) to an account with us without our prior, express written consent. This provision does not apply to checks created on your behalf by the paying bank. If you deposit remotely created checks with us, you agree that we may withhold a portion of the proceeds of such drafts or other funds in your Accounts in a reserve account, in an amount that we reasonably believe may be needed to cover future chargebacks, returned items, and/or claims that such drafts were unauthorized. You grant us a security interest in the reserve account. Unless we agree otherwise in writing with you, reserve funds shall not bear interest. Our rights to charge your

Account for returned remotely created checks will not be limited by the balance or existence of any reserve. Our rights with respect to the reserve, as well as the security interest granted to us, shall survive the termination of this Agreement. We may discontinue accepting remotely created checks at any time without cause or prior notice.

Upon your authorization, or to the extent permitted by law, we may at our option send or otherwise make available your statements in an electronic medium, rather than mailing you a paper-based statement.

**11. Time Account Certificates.** All of the Time Accounts we currently offer are "book entry" Accounts, which means that the Time Account is owned by the person(s) shown on our records, and no certificate is issued by us on the Account. All Time Accounts are non-negotiable and non-transferable. We formerly issued certificates on some Time Accounts and, if we issued a certificate on your Time Account, you must present the certificate in order to make a withdrawal or close the Account. You should notify us at once if your certificate is lost or stolen. At our option, you must give us a bond from a surety company satisfactory to us in an amount not exceeding the balance in the Account, or other satisfactory indemnity, if you close a certificate Account without giving us the certificate.

**12. Joint Personal Accounts; Survivorship Accounts.** For Personal Accounts, if there are more than one of you, your Accounts are "joint Accounts." All deposits in joint Accounts are the property of each owner as joint tenants with rights of survivorship. While all owners are alive, we can honor checks or orders drawn by any owner, honor requests for withdrawals from any owner, release the entire amount on deposit in the joint Account to any owner, allow any owner to close the joint Account, and allow any owner to take all actions that a sole owner could take. Any owner can pledge the joint Account as security or grant a power of attorney to appoint an attorney-in-fact. However, we reserve the right to require the consent and signatures of all joint Account owners to take these actions. Each of you appoints all of the other owners as your true and lawful agents and attorneys-in-fact to conduct any and all banking business relating to your joint Accounts. Each of you also agrees that any other joint owner may endorse your name on any check made payable to you for all purposes, including depositing the check in your joint Account.

You agree that we can follow the directions given, and take action requested by, any owner, even if the directions or actions to be taken are inconsistent with directions or instructions to act given by another owner. We are not liable for continuing to honor checks or other orders drawn on the joint Account by any owner or withdrawals made by any owner even after receiving notice from another owner not to do so. If we do receive notice, we may, but are not obligated to, refuse to honor any checks, orders or withdrawals from the joint Account unless all owners agree in writing. You agree that we can place a hold on funds in your joint Account or pay funds from your joint Account if we receive a garnishment, levy or other governmental order directed against any owner, even if the funds in the joint Account were not deposited by the owner against whom the order is directed.

For joint Accounts "with rights of survivorship" while all owners are living, each joint owner has the rights described above for joint Accounts. When any owner dies, the amounts on deposit in the joint Account pass to the surviving owners. The right of any survivor to obtain his or her share of the deceased owner's funds in a joint Account is subject to our right of set-off and the rights of any person (including us) that holds a security interest in or has any claim to funds in the joint Account.

On all joint Accounts, whether or not "with rights of survivorship," we may honor checks, orders, or requests for withdrawals from the surviving owners after the death of an owner. On joint Accounts without rights of survivorship, we may also honor checks, orders, or requests for withdrawals from the personal representative or legal successor of the deceased owner.

**13. Payable on Death Accounts.** In some states we offer Personal Accounts that are payable on death ("POD"). POD Accounts permit you to designate one or more beneficiaries to receive the funds on deposit in an Account after your death. Until your death, you are the owner of the Account and the beneficiary has no present, vested interest in the Account. You can change a beneficiary at any time. The beneficiary's right to receive the funds in the Account after your death is subject to our right of set-off and to the rights of any person (including us) that holds a security interest in or has any claim to the funds in your Account. On joint POD Accounts, the beneficiary's right to receive the deceased owner's share is subordinate to the surviving owners' rights and the beneficiary will not receive any funds unless all Account owners are deceased. In order to designate a beneficiary, a designation of beneficiary form must be completed and signed by you. If no beneficiary form is available, we will presume that no designation of POD exists.

**14. Fiduciary and Custody Accounts.** Trust Accounts and custody Accounts are fiduciary Accounts in which funds are held by a trustee or custodian for the benefit of another person. We offer a variety of these types of Accounts where permitted by applicable law.

An "in trust for" Account is an Account in which you name yourself as trustee in trust for one or more persons without otherwise establishing a written trust agreement. As with POD Accounts, you are the owner of the Account and the persons you name are considered beneficiaries and have no right to receive funds in the Account until all owners are deceased. The beneficiary's right to receive funds in the Account is subordinate to the rights of any other person (including us) that holds a security interest in or has a claim to the funds in the Account.

A Uniform Gift to Minors Act/Uniform Transfers to Minors Act ("UGMA/UTMA") Account is an Account established under a state law governing gifts or transfers to minors. In general, state law treats the minor as the owner of the Account and the custodian or trustee must hold funds in the Account solely for the benefit of the minor. State laws may restrict the trustee's or custodian's rights to use or withdraw the funds, regulate the appointment of a successor trustee/custodian and require the distribution of funds to the minor when the minor reaches a certain age. You must comply with all of these rules in order to maintain a UGMA/UTMA Account.

Some states have specific laws governing other specific types of fiduciary Accounts, such as Lawyer Trust Accounts. If you establish one of these types of Accounts you agree to comply with all of the laws applicable to such types of Accounts.

With all fiduciary and custody Accounts, the owners and beneficiaries of the Account agree that we will not be liable if the trustee or custodian commits a breach of trust or breach of fiduciary duty, or fails to comply with the terms of a written trust agreement or comply with applicable law. We are not responsible for enforcing the terms of any written trust agreement or applicable law against the trustee or custodian and can rely on the genuineness of any document delivered to us, and the truthfulness of any statement made to us, by a trustee or custodian.

**15. Powers of Attorney.** A power of attorney gives a person you designate as your "attorney-in-fact" the power to handle your affairs on your behalf while you are alive. For joint Accounts, we may require the consent and signatures of all Account owners in order to appoint an attorney-in-fact. All owners of the Account will be bound by any actions taken by the attorney-in-fact in connection with the Account. We do not honor powers of attorney on Business Accounts or Accounts owned by corporations, associations, partnerships, limited liability companies or on Accounts owned by fiduciaries. On other Accounts, we reserve the right not to honor powers of attorney. We will not honor a power of attorney unless it is in a form acceptable to us. We will not honor powers of attorney that do not survive your disability or declared incompetence, or that have limits on the time the power of attorney is in effect. We also will not honor any general power of attorney that does not specifically include detailed provisions granting the power to conduct all banking business on your behalf. If we decide to honor a power of attorney, we can later decide not to honor it any longer. Any attorney-in-fact appointed by you is subject to this Agreement.

**16. Closing Accounts.** We reserve the right to close any or all of your Accounts at any time for any reason whatsoever, including, but not limited to, because you have an excessive number or amount of overdrafts or your account is overdrawn for more than 10 days or if there is a zero balance and no activity for a period of thirty (30) days. If we do so, we will return the balance in the Account (less any amounts owed to us) to you by mailing a check to you at the address listed on our records. Subject to our right to require prior notice of withdrawal on some Accounts as described above, you may close any or all of your Checking Accounts or Savings Accounts at any time for any reason whatsoever.

If an Account is closed, you remain liable for all fees and charges incurred through the date the Account is closed. You also remain liable for all checks and electronic funds transfers drawn on the Account that have not been presented to us for payment and deducted from the Account prior to the time the Account is closed. We are not required to pay you interest that has accrued but not been credited to your Account prior to the date the Account is closed.

**17. Inactive Accounts/Unclaimed Funds.** We will consider a Checking Account inactive when there is no client-initiated activity within 3 consecutive months. Savings Accounts are considered inactive when there is no client-initiated activity within 12 consecutive months. If your Checking Account or Savings Account is inactive we may, in our discretion, decide not to pay checks or honor other requests for withdrawals on the Account until we receive proof that you have signed the checks or authorized the withdrawal. For Time Accounts that are auto-renewing, the applicable period according to state law for determining whether there has been activity commences at the expiration of its initial term. The start of a new term does not constitute activity in the absence of other activity.

State law requires us to transfer the balance in all Accounts to a state agency after a certain period of no withdrawals, deposits or other activity on the Account and no contact with the Account owner. Accounts will be escheated as unclaimed funds pursuant to applicable state law. If this happens to your Account, you must file a claim with the state agency to recover the funds. We are not liable for funds transferred to the state agency.

**18. Death/Incompetence.** Your death, or a declaration that you are legally incompetent to handle your affairs, does not end our authority to pay checks signed by you, to accept deposits or to collect items deposited until we receive written notice of your death or declared incompetence. Even after we receive notice, we can pay checks drawn by you before your death or declared incompetence for up to ten (10) days or any longer period permitted under applicable law.

On joint Accounts, your death or declared incompetence does not affect the rights of any other owner of the Account to make deposits, make withdrawals or, if applicable, write checks. We may require the surviving owners and any POD beneficiary to provide reasonable proof of your death or incompetence and, in some states, provide any tax releases or other documents or consents needed from government authorities before we pay any checks drawn on your joint Account or allow the surviving owners or your beneficiary to withdraw any funds from the Account. Each of you is responsible for notifying us when any other joint owner of an Account dies.

Checks or other items made payable to a deceased joint Account holder (e.g. Social Security checks or electronic deposits) must be returned to the issuer and may not be used, cashed or disposed of in any other way by the surviving Account holders. If such items are used, cashed or disposed of by any one or all of the surviving Account holders each Account holder remains liable for the amount of the item and any charges incurred as a result of the improper use of the item. In our discretion, we can charge your Account for the amount of these items and remit payment to the issuer of the item.

**19. Our Right of Set-off.** We reserve the right to withdraw at any time some or all of the funds that may now or later be on deposit in any or all of your Accounts and apply them to the payment of any debts (other than amounts you may owe us on a personal credit card account with us) you may now or later owe us. We also have the right to set-off against any direct deposit from the federal government to which you are not entitled to. We have this right even if the Account(s) we withdraw money from is a joint Account and the debt we apply it to is owed by only one of you. Likewise, we could withdraw money from an Account owned by only one person and apply it to reduce the joint debt of that person and another person. Our rights under this section are in addition to any right of set-off we may have under applicable law. You agree that our right of set-off is not conditioned on, or limited by, the complete mutuality of the parties obligated on the debt and owners on your Account, the maturity of the debt, the giving of notice to you, or the availability of any collateral securing the debt.

We also have the right to place a hold on funds in your Accounts if we have a claim against you or pending exercise of our right of set-off. If we place a hold on your Account, you may not withdraw funds from the Account and we can refuse to pay checks drawn on the Account.

**20. Adverse Claims; Interpleader; Legal Process.** We need not honor any claim against or involving an Account unless we are required to do so by order of a court or governmental agency that has jurisdiction over us. This rule applies to any person asserting any rights or interest regarding an Account, including you and other persons who are authorized to make withdrawals or write checks or who present a power of attorney signed by you.

If we receive notice of any claim or dispute or of any legal proceeding we reasonably believe involves you or any of your Accounts, in our discretion we may suspend transactions on any Account which we believe to be affected until final determination of the claim or proceeding. We may place a hold on any funds in the Account and suspend transactions whether the affected Account is in your name alone or is a joint Account. Suspension of transactions may, in our discretion, involve placing a hold on any funds in the affected Account or transferring funds from the affected Account to a separate suspension account throughout the pendency of the claim, dispute, or legal proceeding. An Account may be suspended even though the suspension may have been due to inadvertence, error because of similarity of the names of depositors, or other mistake. We also may act upon any notice of garnishment, levy, restraining order, injunction, subpoena or other legal process we reasonably believe to be valid, without independent verification by us. You agree that we are not liable for any damages or losses (including claims based on the return or dishonor of checks) to you caused by the suspension of your Account or action taken in response to legal process, as long as we acted in good faith.

You agree to indemnify us against all losses, costs, attorneys' fees, and any other liabilities that we incur by reason of responding to or initiating any legal action, including any interpleader action we commence, involving you or your Account. As part of that indemnity, in the event we incur liability to a creditor of yours as a result of our response or failure to respond to a legal action, you agree to pay us on demand the amount of our liability to your creditor and to reimburse us for any expense, attorneys' fees, or other costs we may incur in collecting that amount from you.

We may, in our sole discretion and without any liability to you, initiate an action in interpleader to determine the rights of persons making adverse claims to your Account. We may exercise this right regardless of whether the persons making the adverse claims have complied with all statutory requirements pertaining to adverse claims, such as posting a bond or giving other surety. Upon initiation of an interpleader action, we will be relieved and discharged of all further duties and obligations. You agree that any costs associated with the action in interpleader will be charged against any Accounts you maintain with us.

**21. Assignment; Pledge.** You cannot assign or transfer your Account, or pledge your Account as collateral for a loan, without our written consent. We can withhold our consent for any reason. With our consent, any joint owner can pledge the entire Account as collateral for a loan. If we permit you or a joint owner to pledge your Account as collateral for a loan from us, you agree that if the person who pledged the Account dies we can apply the balance in the Account to pay off the loan. You agree that we have this right even if your Account is a joint Account with rights of survivorship or if you have a POD or an "in trust for" Account and have named a beneficiary or beneficiaries to receive your Account balance upon your death.

**22. Waiver of Notices.** We send periodic statements to you on most Checking Accounts and Savings Accounts to show activity on your Account, including any returned items or other credit and debit entries. You agree that these statements are sufficient notice to you and you waive any right to receive any other notice that may be required under clearinghouse rules, the Uniform Commercial Code or other state or federal laws (other than the federal Electronic Funds Transfer Act and the federal Truth in Savings Act).

**23. Check Cashing.** You may be required to provide positive identification when you present a check for payment. We may also limit the dollar amount of checks cashed. We provide check cashing privileges only to our customers. We reserve the right to charge a fee to a non-customer if we decide to cash a check for the non-customer, even if the check is drawn on us. You agree that the charging of such fee is not considered wrongful dishonor. Positive identification for a non-customer shall include the non-customer's thumbprint in most states.

**24. Addresses; Notices.** You agree that if we need to contact you or send you any written (paper-based) information (such as notices, Account statements, checks payable to you, or other communications), we can do so by mail addressed to any of you at the Postal Service address in our records or, at our option, by electronic communication(s) either authorized by you or permitted by law and transmitted by us to your e-mail address in our records. Unless the communication states another effective date, any paper-based communication we send you is effective when mailed to your Postal Service address by delivery to the mail service provider, and any electronic communication we send you is effective when transmitted by us to your e-mail service provider. You must notify us promptly in writing, or by e-mail with written confirmation mailed within five (5) days, if you change your Postal Service or e-mail address or if your e-mail service provider is no longer providing e-mail service for you. In no event shall we have any responsibility, and you hereby release us from all claims and liabilities, for any actions or omissions by you or your e-mail service provider in handling e-mail to or from you, or for any failure in computer hardware, software, or communications lines not maintained by us or under our control.

**25. Arbitration Provision.** This Arbitration Provision sets forth the circumstances and procedures under which a Claim or Claims (as defined below) may be arbitrated instead of litigated in court. This Arbitration Provision supersedes and replaces any existing arbitration provision between you and us. **This Arbitration Provision will apply to your Account(s) unless you notify us in writing that you reject the Arbitration Provision within 60 days of opening your Account(s). Send your rejection notice to KeyBank National Association, P.O. Box 93752, Cleveland, Ohio 44101-5752. Your notice must include your name, the names of any joint account holders and your Account number(s) and must be signed by at least one of the joint account holders. Your rejection notice should not include any other correspondence. Calling us to reject the Arbitration Provision or providing notice by any other manner or format than as described above will not operate as a rejection of this Arbitration Provision and consequently this Arbitration Provision will become part of this Agreement. Rejection of this Arbitration Provision does not serve as rejection of any other term or condition of your Agreement with us governing your Account(s).**

As used in this Arbitration Provision, the word "Claim" or "Claims" means any claim, dispute, or controversy between you and us arising from or relating to this Agreement or your Account(s), including, without limitation, the validity, enforceability, or scope of this Arbitration Provision or this Deposit Account Agreement. "Claim" or "Claims" includes claims of every kind and nature, whether pre-existing, present, or future, including, without limitation, initial claims, counterclaims, cross-claims, and third-party claims, and claims based upon contract, tort, fraud and other intentional torts, constitutions, statute, regulation, common law, and equity (including, without limitation, any claim for injunctive or declaratory relief). The word "Claim" or "Claims" is to be given the broadest possible meaning and includes, by way of example and without limitation, any claim, dispute, or controversy that arises from or relates to (a) any Account subject to the terms of this Agreement (b) any electronic funds transfer from or to any account, (c) advertisements, promotions, or oral or written statements related to this Agreement or your Account, (d) your application for any Account, and (e) the collection of amounts owed by you to us. Notwithstanding this arbitration provision, if you have a Claim that is within the jurisdiction of the small claims court or your state's equivalent court, you may file your Claim there. If that Claim is transferred, removed or appealed to a different court, then we have the right to choose arbitration.

This Arbitration Provision will not apply to Claims previously asserted, or which are later asserted, in lawsuits filed before the effective date of this Arbitration Provision or any prior arbitration provision between you and us, whichever is earlier. However, this Arbitration Provision will apply to all other Claims, even if the facts and circumstances giving rise to the Claims existed before the effective date of this Arbitration Provision.

Any Claim shall be resolved, upon the election of you or us, by binding arbitration pursuant to this Arbitration Provision and the applicable rules of either the American Arbitration Association or J.A.M.S/Endispute in effect at the time the Claim is filed (the "Arbitration Rules"). You may select one of these organizations to serve as the arbitration administrator if you initiate an arbitration against us or if either you or we compel arbitration of a Claim that the other party has brought in court. In addition, if we intend to initiate an arbitration against you, we will notify you in writing and give you twenty (20) days to select one of these organizations to serve as the arbitration administrator; if you fail to select an administrator within that twenty (20)-day period, we will select one. In all cases, the arbitrator(s) should be a lawyer with more than ten (10) years of experience or a retired judge. If for any reason the selected organization is unable or unwilling or ceases to serve as the arbitration administrator, you will have twenty (20) days to select a different administrator from the above list; if you fail to select a different administrator within the twenty (20)-day period, we will select one. In all cases, a party who has asserted a Claim in a lawsuit in court may elect arbitration with respect to any Claim(s) subsequently asserted in that lawsuit by any other party or parties.

**IF ARBITRATION IS CHOSEN BY ANY PARTY WITH RESPECT TO A CLAIM, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OR HAVE A JURY TRIAL ON THAT CLAIM, OR TO ENGAGE IN PRE-ARBITRATION DISCOVERY EXCEPT AS PROVIDED FOR IN THE APPLICABLE ARBITRATION RULES. FURTHER, YOU WILL NOT HAVE THE RIGHT TO PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION. EXCEPT AS SET FORTH BELOW, THE ARBITRATOR'S DECISION WILL BE FINAL AND BINDING. YOU UNDERSTAND THAT OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT MAY ALSO NOT BE AVAILABLE IN ARBITRATION. THE FEES CHARGED BY THE ARBITRATION ADMINISTRATOR MAY BE GREATER THAN THE FEES CHARGED BY A COURT.**

There shall be no authority for any Claims to be arbitrated on a class action or private attorney general basis. Furthermore, arbitration can only decide your or our Claim(s) and may not consolidate or join the claims of other persons that may have similar claims. There shall be no pre-arbitration discovery except as provided for in the applicable Arbitration Rules. Any arbitration hearing that you attend shall take place in the federal judicial district of your residence. At your written request, we will pay all fees charged by the arbitration administrator for any Claim(s) asserted by you in the arbitration, after you have paid an amount equivalent to the fee, if any, for filing such Claim(s) in state or federal court (whichever is less) in the judicial district in which you reside. (If you have already paid a filing fee for asserting the Claim(s) in court, you will not be required to pay that amount again.) If the arbitrator issues an award in our favor, you will not be required to reimburse us for any of the fees we have previously paid to the administrator or for which we are responsible. Each party shall bear the expense of that party's attorneys', experts', and witness fees, regardless of which party prevails in the arbitration, unless applicable law and/or this Agreement gives you the right to recover any of those fees from Us. In the event you do not prevail in the arbitration, we will not seek to recover our attorneys', experts' or witness fees from you. This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. Sections 1 et seq. The arbitrator shall apply applicable substantive law consistent with the FAA and applicable statutes of limitations and shall honor claims of privilege recognized at law and, at the timely request of any party, shall provide a brief written explanation of the basis for the award. In conducting the arbitration proceeding, the arbitrator shall not apply the federal or any state rules of civil procedure or rules of evidence. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA and except that, if the amount in controversy exceeds $10,000.00, any party can appeal the award to a three-arbitrator panel administered by the arbitration administrator which shall reconsider de novo (i.e., without regard to the original arbitrator's findings) any aspect of the initial award requested by the appealing party. The decision of the panel shall be by majority vote. The costs of such an appeal will be borne by the appealing party regardless of the outcome of the appeal.

This Arbitration Provision shall survive termination of all of your Accounts subject to this Agreement. If any portion of this Arbitration Provision is deemed invalid or unenforceable under any law or statute consistent with the FAA, it shall not invalidate the remaining portions of this Arbitration Provision or the Agreement. In the event of a conflict or inconsistency between the applicable Arbitration Rules and this Arbitration Provision, this Arbitration Provision shall govern.

<h3 style="text-align:center">Contacting Arbitration Administrators</h3>

If you have a question about the arbitration administrators mentioned in this Arbitration Provision or would like to obtain a copy of their Arbitration Rules or fee schedules, you can contact them as follows: **American Arbitration Association,** 1633 Broadway, 10th Floor, New York, New York 10019, www.adr.org, (800) 778-7879, Commercial or Consumer Rules, **J.A.M.S/Endispute,** 222 South Riverside Plaza, Suite 1850, Chicago, IL 60606, www.jams-endispute.com, (800) 352-5267, Financial Services Arbitration Rules and Procedures.

**26. Applicable Law.** This Agreement and all Accounts shall be governed by the laws of the State of Ohio (without regard for conflict of law rules) and applicable federal law, but with respect to all fees and charges related to your Account, federal law alone shall control.

**27. Amendments; Non-Waiver; Severability.** We reserve the right to change or add to the terms and conditions of this Agreement or change the terms of your Account at any time. We will give you such notice of the change as we determine is appropriate, such as by statement message or enclosure, letter, or as posted in the branch, and as required under applicable law. Where applicable law permits, we can notify you of the changes by posting a new version of this Agreement, or a notice of change to Accounts, in our branches.

We may decide not to enforce this Agreement or delay enforcing it in some circumstances or at some times. If we do so, you agree that we can still enforce this Agreement in the same circumstances at another time, in other circumstances or at other times. If any provision of this Agreement is declared by a court to be invalid or unenforceable, the remaining provisions of this Agreement shall be enforced and construed as if the invalid provisions were not contained in this Agreement.

**28. Credit Reports.** You authorize us to obtain information about you, including a credit report, from third parties. If you ask, you will be told whether a credit report was requested and, if so, the name and address of the credit reporting agency that furnished the report. We may report information about your Account to a consumer reporting agency. Overdrafts on your Account, closure of your Account and other information related to your Account may be reported.

**29. Disclosure of Account Information.** We may share information within the KeyCorp family of companies as well as with unaffiliated third parties external to Key as described in our Privacy Policy. **You specifically consent to us sharing information within the KeyCorp family of companies and with external unaffiliated third parties.**
**Note:** You may elect to opt out of information sharing, or may be automatically opted-out under your state law, as described in our Privacy Policy. If you are opted out, that election will override this consent to share, except for those instances in which we are otherwise permitted to share by law without your consent.

**30. Electronic Authentication or Signature; Electronic Records.** At our option we may adopt or accept commercially reasonable authentication procedures and/or electronic signatures to: (a) verify the identity of a sender of Electronic Records, (b) determine the Electronic Record has not been altered during electronic transmission or storage, and (c) authenticate the sender's Electronic Signature and attribute the Electronic Record to such sender. Each party hereto may adopt as its signature an electronic identification consisting of symbol(s) or codes(s) **("Electronic Signatures")**, which may be affixed to or contained in electronic agreements, records or data **("Electronic Records")** transmitted by you or us to the other party. Such Electronic Signature so affixed to or contained in any Electronic Record shall be sufficient to verify the originating party and to evidence such party's acceptance of and agreement to be bound by the terms and conditions of such Electronic Record. Neither party shall disclose to any unauthorized person the confidential Electronic Signature of the other party.

**31. Enforceability of Electronic Records and Signed Documents.** The terms and conditions of any Electronic Record properly transmitted by you or us to the other party shall be considered in connection with any contemplated transaction to be a "writing" or "in writing" and shall be considered as authenticated by an Electronic Signature. Any Electronic Record containing an Electronic Signature **("Signed Documents")** shall be deemed for all purposes (a) to have been "signed" and (b) to constitute an "original" when printed from Electronic Records established and maintained by us or our authorized agents in the normal course of business. You agree not to contest the authorization for, or validity or enforceability of, Electronic Records and Signed Documents, or the admissibility of copies thereof, under any applicable law relating to whether certain agreements, files or Electronic Records are to be in writing (documentary form) or signed by the party to be bound thereby. Electronic Records and Signed Documents, if introduced as evidence on paper in any judicial or other proceeding will be admissible to the same extent and under the same conditions as other documentary business records.

Upon our written request, you agree to manually sign or place your signature on any paper original of any Electronic Record or Signed Document we provide to you containing your purported Electronic Signature. You irrevocably authorize and appoint us as your lawful attorney-in-fact with full power and authority to sign, in your name and on your behalf, any such original of any Electronic Record or Signed Document, if you fail or are unable, for any reason, to sign such original no later than ten days after our request to you to do so.

## PART II - FUNDS AVAILABILITY POLICY

Our Funds Availability Policy for deposits to all Personal deposit account and specified Business deposit account types described in section 4. below is to make funds from your cash and all check deposits available to you on the first business day after the day we receive your deposit. Our Funds Availability Policy for deposits to all other Business deposit account types as stated in section 5. below is to make funds from your cash and most check deposits available to you on the first business day after the day we receive your deposit. Some check deposits will not be available until the second business day after the day we receive your deposit. This policy applies to all deposit channels.

The sum of cash, checks, and other items which have been on deposit long enough to be available for withdrawal under this section is called your Available Balance. We make funds from your deposits available to you as explained below. Until funds are available, you will not be able to use them for certain transactions. For example, you will not be able to withdraw the funds in cash, nor will you be able to have checks certified against them. For certain other uses, we may make funds available during this delay period; however we may charge you for this service. Refer to the Deposit Account Fees and Disclosures for details about any fees that may be assessed.

**1. Determining the Availability of a Deposit.** The length of the delay is counted in business days beginning with the business day following the day of your deposit. Every day is a business day except Saturdays, Sundays, and legal holidays. Our business day starts no later than 9:00 a.m. local time. Deposits made after 7:00 p.m. local time on any business day at an automated teller machine ("ATM") owned and operated by us will be considered received by us on the next business day. You can identify ATMs owned and operated by us by the initial screen message. Deposits made at an ATM not owned and operated by us will be available for withdrawal within five (5) business days. Deposits made using the Mobile Deposit service to an eligible Personal deposit account after 11:00 p.m. Eastern Time on any business day will be considered received by us on the next business day.

Some of our branches have "cutoff" times. If you make a deposit at one of these branches before the cutoff time on a business day we are open we will consider that day to be the day of your deposit. However, if you make a deposit after the cutoff time or on a day we are not open, we will consider that the deposit was made on the next business day we are open. The cutoff time may vary by location but will not be earlier than 2:00 p.m. If the cutoff time is earlier than the branch closing time, the cutoff time will be posted in the branch. The length of the delay varies depending on the type of deposit and is explained below.

Deposits containing 500 or more checks may be subject to a branch specific cut-off time. If a cut-off time applies it will be posted at the branch. Deposits of 500 or more checks made at a branch before the posted cut-off time will be considered received that business day. Deposits of 500 or more checks made at the branch after the posted cut-off time will be considered a next-business day deposit and processed accordingly. Cash is not subject to the cut-off time and will be verified and credited the same-day. The cut-off time may vary by location but will not be earlier than 2:00 p.m. local time.

**2. Same-Day Availability.** Direct deposits of electronic payments, such as Social Security benefits and payroll direct deposits are available on the business day that the funds are due to you. Wire transfers received by 6:00 p.m. Eastern Time, cash deposits made in a KeyBank branch and cash deposits made at a KeyBank image ATM are available on the business day of deposit.

**3. Next-Day Availability.** Funds from the following types of deposits and check deposits as described in section number 4. below are available on the first business day after the day of your deposit.

- U.S. Treasury checks that are payable to you.
- Wire transfers received after 6:00 p.m. Eastern Time on a business day will be considered received on the next business day and will not be available until that business day.
- Cash deposits made at a KeyBank envelope ATM.
- All checks drawn on KeyBank National Association. (In some instances funds may be available on the same business day of deposit.)
- If you make the deposit in person to one of our employees at one of our branches, funds from the following deposits are also available on the first business day after the day of your deposit:
  - State and local government checks deposited in that state into KeyBank accounts that are payable to you, if you use a special deposit slip which can be obtained at the teller window.
  - Cashier's, certified, and teller's checks that are payable to you, if you use a special deposit slip which can be obtained at the teller window.
  - Federal Reserve Bank checks, Federal Home Loan Bank checks, and postal money orders, if these items are payable to you.

If you do not make your deposit in person to one of our employees at one of our branches (for example, if you mail the deposit) funds from these deposits may not be available until the second business day after the day we receive your deposit.

**4. Other Check Deposits to any type of Personal deposit account including mobile deposits made to a Personal deposit account and the following types of Business deposit accounts: Key Business Reward Checking, Key Business Basics Checking, KeyBank Basic Business Checking, Key Business Checking, KeyBank Business Interest Checking, IOLTA/IOLA/IOTA/RAHF/IORTA, Key Business Saver, Key Business Silver Money Market Savings, Key Business Platinum Money Market Savings, Key Business Gold Money Market Savings.** The first $100 of your total deposits, excluding mobile deposits made to a Personal deposit account, made on a business day will be available to you on that same business day. The remaining funds from deposits of checks will be available on the first business day after the day of your deposit. For a mobile deposit made to a Personal deposit account, all funds will be available on the first business day after the day of your deposit.

**5. Other Check Deposits to all other types of Business deposit accounts not listed above in section number 4.** The first $225 of each deposit will be made available on the next business day after the day of deposit and the rest of the deposit will be available no later than the second business day after the day of deposit, with the following exception. Checks with the first four digits of the routing and transit numbers of 1214 or 3214 will be available no later than the third business day.

**6. Longer Delays May Apply.** In some cases, we will not make all of the funds that you deposit by check available at the times shown above.

**Case-by-Case Hold:** Depending on the type of check that you deposit, funds may not be available until the second business day after the day of your deposit. However, the first $225 of your total deposits made on a business day will be available to you on the next business day.

If we are not going to make all funds from your deposit available at the times shown above, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to a bank employee at a branch, or if we decide to take this action after you have left the premises, we will mail you the notice not later than the close of the business day following the banking day you made your deposit, or on the business day we learn of the reason requiring delay.

If you need the funds from a deposit right away, you should ask us when the funds will be available.

**Exception Holds:** In addition, funds you deposit by check may be delayed for a longer period under the following circumstances:
- We believe a check you deposit will not be paid.
- You deposit checks totaling more than $5,525 on any one day.
- You redeposit a check that has been returned unpaid.
- You have overdrawn your account repeatedly in the last six months.
- There is an emergency, such as failure of computer or communications equipment or other conditions beyond our control.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available for withdrawal no later than the fifth business day after the day of your deposit. In case of emergency conditions, a notification of any delay in your ability to withdraw funds will be provided within a reasonable time and in a reasonable manner given the emergency circumstances unless funds subject to this delay are made available before such notification must be provided.

**7. Special Rules for New Accounts.** If you are a new customer, the following special rules may apply, at our discretion, during the first 30 days your account is open instead of the rules described above.

Funds from electronic direct deposits to your account will be available on the business day that the funds are due to you. Funds from deposits of cash, wire transfers, and the first $5,525 of a day's total deposits of cashier's, certified, teller's, traveler's, and federal, state and local government checks will be available on the first business day after the day of your deposit if the deposit meets certain conditions. For example, the checks must be payable to you (and you may have to use a special deposit slip). The excess over $5,525 will be available no later than the fifth business day after the day of your deposit. If your deposit of these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first $5,525 will not be available until the second business day after the day of your deposit.

Funds held from all other check deposits will be available on the fifth business day after the day of your deposit.

**8. Hold on Other Funds.** If we cash a check for you that is drawn on another bank, we may withhold the availability of a corresponding amount of funds that are already in your account. Those funds in your account will be available 2 business days after the day the check is cashed.

(ID 1938-512)